**EXHIBIT . . . . . . A**

# CRIMINAL LAW AND PROCEDURE

*Prisoner convicted of simple possession of heroin and sentenced to 25 years to life because of prior kidnapping convictions is granted habeas relief.*

Cite as 2002 DJDAR 12829

RICHARD MARTIN DURAN,
Petitioner,
v.
ROY CASTRO, WARDEN, t al.,
Respondents.

No. CIV. S-00-305 LKK/JFM
United States District Court
Eastern District of California
Filed October 18, 2002

Petitioner, a state prisoner, brings an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72-302, his application was referred to the magistrate judge who recommended that the application be denied. Petitioner, through counsel, has objected to the magistrate judge's findings and recommendation. I consider petitioner's objections on the pleadings and papers filed herein and without oral argument.[1] See Local Rule 78-230(h).

❦

## FACTUAL AND PROCEDURAL BACKGROUND

On January 4, 1997, J.C. Penney store security officers detained petitioner, Richard Duran, for attempting to shoplift a belt and a pair of socks worth a total of $26.99. A long-time heroin addict, Duran was found to have 1.55 grams of heroin and a syringe in his possession. Duran was charged with simple possession of heroin and petty theft with a prior.

Duran pled guilty to possession of 1.55 grams of heroin in exchange for the dismissal of the petty theft charge and a recommendation that he serve no more than twenty-five years to life in prison. Under the terms of the agreement, Duran admitted that he had suffered two prior serious felonies–two 1989 kidnapping convictions stemming from a single incident where, upon being refused a ride by a woman, Duran grabbed her seven-year-old son and told the woman to do as he said or he would hurt the boy. Keeping its end of the bargain, the State dismissed the petty theft

charge with the understanding that the judge could consider it at sentencing.[2]

The trial judge sentenced Duran to twenty-five years to life. In light of Duran's criminal history the judge explained, "I still see your record as just a person who just can't make it outside. . . I truly feel if you were given a shorter sentence, you wouldn't be out two minutes before you reoffended."[3] See People v. Duran, Third Appellate Dist. No. CO28055 at 6 (filed March 31, 1999).

Duran appealed to the California Court of Appeals. Among other things, he argued that his sentence was cruel and unusual in violation of the Eighth Amendment. The California Court of Appeals rejected this claim. See id. The California Supreme Court denied review and Duran, proceeding pro se, brought an application for a writ of habeas corpus in this court. Upon receipt of the magistrate judge's findings and recommendation that petitioner's application be dismissed, and after a review of the record, this court appointed counsel for the petitioner.

## II.

## ANALYSIS

This court was initially prompted to appoint counsel for petitioner after the Ninth Circuit issued two decisions finding the application of California's Three Strikes law unconstitutional, albeit under circumstances different than those at bar. See Andrade v. Attorney General of the State of California, 270 F.3d 743 (9th Cir. 2001); Brown v. Mayle, 278 F.3d 1019 (9th Cir. 2002). The fact that the Supreme Court has granted certiorari in one of those decisions, see Lockyear v. Andrade, 122 S.Ct. 1434 (2002), would ordinarily warrant a stay of the proceedings in this matter pending a decision by the High Court. That said, the factual differences between this case and Andrade are significant. Moreover, review of this case has raised questions not addressed by the Ninth Circuit in Andrade or Brown, supra. In particular, this case requires consideration of the effect of the California Supreme Court's interpretation of petitioner's sentence as a life sentence without parole. I also consider here, apart from the rationale in Brown, 278 F.3d at 1036, how the Double Jeopardy Clause circumscribes the relevance of petitioner's recidivism for purposes of proportionality review. Thus, while the grant of certiorari may suggest a stay, this case is sufficiently distinct from Andrade that a decision there may not be dispositive here. Accordingly, prompt resolution appears appropriate.

For the reasons that follow, the court concludes that petitioner's objections to the magistrate judge's findings and recommendations must be sustained, and that his application for a writ of habeas corpus must be granted.

## A. THE STATE COURT'S DECISION

The petitioner challenged his sentence on Eighth Amendment grounds. The California Court of Appeals responded with one sentence:

> In light of defendant's recidivism and extensive criminal history, we also reject his contention that the sentence of 25 years to life constitutes cruel and unusual punishment in violation of the Eighth Amendment of the federal Constitution and article

---

[1] The district court reviews de novo the magistrate judge's conclusions of law and those portions of the proposed findings of fact to which objection has been made. See 28 U.S.C. § 636(b)(1)(C). The court may, however, assume the correctness of that portion of the proposed findings of fact to which no objection has been made. See United States v. Remsing, 874 F.2d 614, 617 (9th Cir. 1989). The court is not bound to adopt the magistrate judge's findings and recommendations, but should exercise "sound judicial discretion" in making its own determination on the record. United States v. Roddatz, 447 U.S. 667, 675-76 (1980).

[2] Petitioner, who filed his habeas petition pro se, did not attack the validity of his plea agreement or raise an ineffective assistance of counsel claim. Nonetheless, I cannot help but note that the disposition obtained for petitioner was a plea bargain only in the most oxymoronic sense.

[3] After serving his term for kidnapping, petitioner had been out of prison for about a year before he was charged with possession of heroin.

Tuesday, N

I, section 17 of the California Constitution. (Cf. People v. Cartwright (1995) 39 Cal.App.4th 1123, 1134-37).

See People v. Duran, Third Appellate Dist. No. CO28055 at 6-7 (filed March 31, 1999).[4]

Petitioner's application for a writ of habeas corpus depends upon whether the Court of Appeals' summary rejection of his Eighth Amendment challenge was either contrary to Supreme Court precedent or amounted to an unreasonable application of clearly established Supreme Court precedent. See Van Tran v. Lindsay, 212 F.3d 1143, 1155 (9th Cir. 2000).[5] I turn now to the Supreme Court's Eighth Amendment jurisprudence and its application in petitioner's case.

**B. EIGHTH AMENDMENT ANALYSIS OF PETITIONER'S SENTENCE UNDER CLEARLY ESTABLISHED SUPREME COURT PRECEDENT**

While the Eighth Amendment prohibits excessive punishments, it does not make clear how courts are to determine the boundary beyond which punishments become excessive. This is especially so where the penalty is a fine, see United States v. Bajakajian, 524 U.S. 321, 335-36 (1998), or a term of imprisonment. See Harmelin v. Michigan, 501 U.S. 957, 1001 (1991)(Kennedy, J., concurring)(citing Solem v. Helm, 463 U.S. 277, 289-90 (1983)(quoting Rummel v. Estelle, 445 U.S. 263, 272 (1980))).

Because it is said that courts are not particularly suited to determine the appropriate term of imprisonment for a given crime, see id. at 1000, Eighth Amendment jurisprudence has developed a restrictive set of criteria.[6]

When reviewing a sentence of imprisonment under the Eighth Amendment, courts need not find "strict proportionality." Rather, the term of imprisonment will fail to pass constitutional muster only in cases of "extreme sentences that are 'grossly disproportionate' to the crime." Id. (citing Solem v. Helm, 463 U.S. 277, 288 (1983)). The Supreme Court has observed that such instances "have been exceedingly rare." Rummel v. Estelle, 445 U.S. 263, 272 (1980); see also Solem, 463 U.S. at 289-90 (1983); Harmelin, 501 U.S. at 1001 (Kennedy, J., concurring).

Having acknowledged the difficulty inherent in line-drawing, however, it is equally certain that relativism cannot serve as a guiding principle. The courts are not free to abdicate their responsibility to determine the limitations created by the Eighth Amendment in favor of unconstrained legislative power. Instead, "guided by objective factors," courts must review penalties for gross disproportionality. See Harmelin, 501 U.S. at 1001 (Kennedy, J., concurring)(citing Solem, 463 U.S. at 277 (1983)); Bajakajian, 524 U.S. at 336-37 (1998)(applying the standard for gross disproportionality set forth in Solem, 463 U.S. at 288, to the question of whether a fine was excessive in violation of the Eighth Amendment); Solem, 463 U.S. at 288, 290-91. The Supreme Court has prescribed the process for such a review as first requiring the reviewing court to determine whether a "threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." Harmelin, 501 U.S. at 1001 (Kennedy, J., concurring).[7] If so, the court should undertake the intrajurisdictional and interjurisdictional analyses set forth in Solem, see id., that is, compare the challenged sentence with "the sentences imposed on other criminals in the same jurisdiction," and with "the sentences imposed for commission of the same crime in other jurisdictions." Solem, 463 U.S. at 292. Below, I apply the prescribed process.

**I. A Threshold Comparison of Petitioner's Sentence and Offense**

**a. Harshness of the Penalty**

The Ninth Circuit has noted numerous aspects of California's Three Strikes law which "combine to make it particularly severe." Andrade, 270 F.3d at 748; see also Brown, 238 F.3d at 1021. Rather than reiterate most of the Circuit's observations, I simply note that, in large part, they apply with equal force to the petitioner in this case.[8] What

---

[4] Because the California Supreme Court denied petitioner's review petition without comment, the relevant opinion is that of the state court of appeal, as it is the last reasoned decision on petitioner's Eighth Amendment claim. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991).

[5] Federal habeas corpus relief is reserved for violations of the Constitution and the laws of the United States. See 28 U.S.C. § 2254(a). "Under AEDPA, we may reverse a state court's decision denying relief only if that decision is "contrary to, or involves an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.'" Van Tran v. Lindsay, 212 F.3d 1143, 1149 (9th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(1)). The Ninth Circuit has explained these standards as follows:

A state court's decision can be "contrary to" federal law either 1) if it fails to apply the correct controlling authority, or 2) if it applies the controlling authority to a case involving facts "materially indistinguishable" from those in a controlling case, but nonetheless reaches a different result. A state court's decision can involve an "unreasonable application" of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable.

Van Tran v. Lindsey, 212 F.3d 1143, 1150 (9th Cir. 2000)(citing Williams v. Taylor, 529 U.S. 362, 405-09 (2000)).

[6] It is, to say the least, not apparent why legislators, who have no experience fixing actual sentences, are more qualified than judges, whose business it is to actually sentence. Indeed, historically, legislatures, recognizing their limitations, provided only broad parameters for punishment, leaving to the experienced judiciary the task of fixing the actual sentence. The recent trend towards more restrictive statutes reflects discontent with perceived disparities and is not predicated upon asserted superior legislative insight.

Moreover, even assuming legislatures were in a better position to fix sentences than judges, the law considered here is the result of the

initiative process—a process not noted for careful and deliberate consideration. See Carver v. Nixon, 72 F.3d 633, 644 (8th Cir. 1995)("The process of enactment, while perhaps not always perfect, includes deliberation and an opportunity for compromise and amendment, and usually committee studies and hearings. These are substantial reasons for according deference to legislative enactments that do not exist with respect to proposals adopted by initiative.")(citing Yniguez v. Arizonans for Official English, 69 F.3d 920, 930-31 (9th Cir. 1995)(en banc)(noting ballot initiative lacked legislative findings and was not subjected to extensive hearings or analysis)).

[7] The test set forth in Justice Kennedy's concurrence is the "'rule of Harmelin' because it is the 'position taken by those Members who concurred in the judgment[] on the narrowest grounds . . . .'" Andrade v. Attorney General of the State of California, 270 F.3d 743, 754 (9th Cir. 2001)(quoting United States v. Bland, 961 F.2d 123, 128-29 (9th Cir. 1992)).

[8] The only notable difference between the "particularly severe" application of Three Strikes in Andrade and Brown and its application in petitioner's case is that petitioner's principal offense was not a "wobbler" that could be characterized as a misdemeanor or a felony. Rather, possession of heroin is a felony. As I discuss, infra, however, that petitioner's offense is a felony in name does not alter the minor nature of that offense.

---

the Circuit
consequenc
California's
petitioner.
important to

Under C
cruel and
assumption
served."
Proceeding:
444 (Cal. C
910, 918-1
People v. W
assumption
binding on
effect of C
Wilbur, 42
construction
federal cou
in prison
available ne
at 297.

**b. G**
The mini
with the se
the "harm c
the culpabil
is clear th
categorized
of a serious

First, sin
See Solem.
serious tha
violence").
carries no s
heroin, for v
Amendment
667 (1962).
addict who

---

[9] Such an
formalistic. In
term-to-life sen
to Expand Rec
Budget Bill: Be
of not releasing

Of course, t
and of itself, be
the purposes of
("the possibility
from a person s
sentence of life

Rather, the
assessments of
proportionality.
Rummel Court
parole. Instead
including the fa
good time cred
of finding Solen
if petitioner's o
parole, the paro
than the one bef

Here, the St
of life without p
would make unc
cannot look to a
sentence.

[10] In considerin
the principal fel
are, however, "r
infra.

ber 12, 2002

ent under the
find "strict
onment will fail
s of "extreme
to the crime."
3 (1983)). The
ces "have been
U.S. 263, 272
89-90 (1983);
occurring).
erent in line-
that relativism
rts are not free
the limitations
f unconstrained
ective factors,"
proportionality.
(Kennedy,   J.,
277   (1983));
X(applying the
l in Solem, 463
was excessive
m, 463 U.S. at
prescribed the
the reviewing
nparison of the
ed leads to an
elin, 501 U.S.
ie court should
erjurisdictional
s, compare the
posed on other
"the sentences
rime in other
ow, I apply the

ner's Sentence

us aspects of
pine to make it
t 748; see also
ate most of the
large part, they
is case.⁸ What

l and deliberate
3, 644 (8th Cir.
ot always perfect,
compromise and
rings. These are
ve enactments that
initiative.")(citing
). 930-31 (9th Cir.
ative findings and

ce is the "rule of
ise Members who
...." Andrade v.
743, 754 (9th Cir.
, 128-29 (9th Cir.

uticularly severe".
d its application in
as not a "wobbler"
a felony. Rather,
fra, however, that
he minor nature of

the Circuit did not address in Andrade or Brown is the consequence for Eighth Amendment analysis of California's own interpretation of the sentence given petitioner. As I now explain, that interpretation has important consequences in resolving the matter at bar.

Under California law, when a sentence is challenged as cruel and unusual, it must be examined "under the assumption that the maximum possible sentence will be served." 22 CAL. JUR.3D Criminal Law: Post-Trial Proceedings § 164(citing People v. Morgan, 36 Cal.App.3d 444 (Cal. Ct. App. 1973)); see also In re Foss, 10 Cal.3d 910, 918-19 (1974) (disapproved on other grounds by People v. White, 16 Cal.3d 791 (1976)). The state courts' assumption that the maximum sentence will be served is binding on this court as an authoritative construction of the effect of California's sentencing law. See Mullaney v. Wilbur, 421 U.S. 684, 691 (1975)(state supreme court's construction of State's own law is authoritative). In sum, federal courts must consider petitioner's sentence to be life in prison without parole– the most severe punishment available next to capital punishment.⁹ See Solem, 463 U.S. at 297.

● Gravity of the Principal Offense
The minor nature of petitioner's offense contrasts starkly with the severity of his punishment. Taking into account the "harm caused or threatened to the victim or society, and the culpability of the offender," Solem, 463 U.S. at 292, it is clear that, while simple possession of heroin is categorized as a felony in California, it lacks the earmarks of a serious offense.¹⁰

First, simple possession of heroin is a non-violent crime. See Solem, 463 U.S. at 292 ("[N]onviolent crimes are less serious than crimes marked by violence or the threat of violence"). The possession of a small amount of heroin carries no more threat of violence than does addiction to heroin, for which imprisonment is proscribed by the Eighth Amendment. See Robinson v. California, 370 U.S. 660, 667 (1962). Indeed, as a matter of common experience, an addict who is not in possession of narcotics likely poses a

greater risk to the community than one who possesses the means to satisfy his or her craving.¹¹

A second, and related consideration is the magnitude of the harm caused or threatened by petitioner's offense. See Solem, 463 U.S. at 293 ("absolute magnitude of the crime may be relevant. Stealing a million dollars is viewed as more serious than stealing a hundred dollars"). Petitioner was convicted of possession of 1.55 grams of heroin, which was presumptively and, as apparent by the paraphernalia on his person at the time of his arrest, actually for his personal use. Unlike the drug offenses previously reviewed by the Supreme Court on proportionality challenges, petitioner's offense did not involve the distribution of controlled substances and all the attendant social problems caused thereby.¹² See Harmelin, 501 U.S. at 1002-1003 (Kennedy, J., concurring); see also Hutto v. Davis,454 U.S. 370, 372 n.1 (1982)(forty years in prison for possession of marijuana with intent to distribute did not constitute cruel and unusual punishment in light of evidence before the jury that defendant was an active drug dealer who had, among other things, sold drugs to be smuggled into prison).

Finally, and perhaps most significantly, I note that, in the judgment of the legislators and voters of California, simple possession of heroin is neither a serious nor violent crime. Cf. Harmelin, at 999-1000. California's Three Strikes law itself does not categorize simple possession of heroin as a serious or violent crime. See Cal. Penal Code §§ 667(d), 667.5(c), 1192.7(c) (defining serious or violent crimes that would qualify as first or second strikes). Nor, outside of the context of Three Strikes, is simple possession penalized harshly. At the time petitioner was sentenced, the maximum sentence available for simple possession of heroin was three years. Moreover, courts were given discretion to grant probation or order diversion. See Cal. Penal Code § 1000. With the passage of Proposition 36 in 2000, this discretion has become a mandate. Absent factors in aggravation, a simple possession conviction merits only probation and drug treatment. Incarceration may not be imposed.¹³ See Cal. Penal Code § 1210.1. Of course, in

---

⁹  Such an interpretation of petitioner's sentence is not merely formalistic. Indeed, at present the availability of parole for those with term-to-life sentences is very much in question. See Petitioner's Request to Expand Record, Exh. 1, Legislative Analyst's Analysis of 2000-02 Budget Bill: Board of Prison Terms, at 2-3 (discussing unwritten policy of not releasing life-term inmates on parole).

Of course, the fact that parole is discretionary would generally not, in and of itself, be enough to render the possibility of parole irrelevant for the purposes of proportionality review. See Rummel, 445 U.S. at 280-81 ("the possibility of parole, however slim, serves to distinguish Rummel from a person sentenced under a recidivist statute...which provides for a sentence of life without parole...").

Rather, the United States Supreme Court has made practical assessments of the availability of parole in reviewing a prison term for proportionality. See Solem, 463 U.S. 277 at 302 (explaining that the Rummel Court "did not rely simply on the existence of some system of parole. Instead it looked to the provisions of the system presented, including the fact that Texas had 's relatively liberal policy of granting good time credits to its prisoners ...."); id. at 303 (noting, in the course of finding Solem petitioner's life sentence was disproportionate, that even if petitioner's sentence was commuted to life with the possibility of parole, the parole system to which he was subject was "far more stringent than the one before us in Rummel.").

Here, the State court's interpretation of petitioner's sentence as that of life without parole coincides with the practical assessment this court would make under Solem, supra. Like the petitioner in that case, Duran cannot look to a liberal parole policy to mitigate the harshness of his life sentence.

¹⁰  In considering the gravity of the offense, the court must "focus on the principal felony." Solem, 463 U.S. at 296 n.21. Prior convictions are, however, "relevant to the sentencing decision," id., and are discussed infra.

¹¹  Obviously, it does not follow that all controlled substances share this characteristic. A person in possession of PCP, for example, likely poses a fairly serious threat of violence.

¹²  I cannot agree with respondent that, under Harmelin, simple possession of heroin may be considered a serious risk to society. Respondent cites Justice Kennedy's observation that,

   Quite apart from the pernicious effects on the individual who consumes illegal drugs, such drugs relate to crime in at least three ways: (1) A drug user may commit crime because of drug-induced changes in physiological functions, cognitive ability, and mood; (2) A drug user may commit crime in order to obtain money to buy drugs; and (3) A violent crime may occur as part of the drug business or culture.

Id.   This observation, however, does not support the premise that petitioner's heroin possession posed a serious threat to society. Justice Kennedy cited a statistical relationship between crime and drugs to support his conclusion that a drug dealer, who had 672 grams of cocaine for distribution, could reasonably be thought to pose a serious threat to society. See id. at 1003. While statistics may tend to show that this amount of cocaine, distributed throughout a community, would result in "violence, crime, and social displacement," id., they do not show that a given individual in possession of just any controlled substance would resort to violence and crime. Nor did Justice Kennedy purport to make that connection.

¹³  In passing Proposition 36, California voters reiterated their judgment that simple possession offenses were not serious. The stated purpose of Proposition 36 was, in pertinent part, to "preserv[e] jails and prison cells for serious and violent offenders, and to improve public health by reducing drug abuse and drug dependence through proven and effective drug treatment strategies." See 2000 Cal. Legis. Serv. Prop. 36 § 3(c).

reviewing petitioner's sentence, the California Court of Appeals could not have known that Proposition 36 would come to pass. It is noteworthy only as it epitomizes what was evident both in reality and as a matter of legislative judgment well before its passage, namely, the minor nature of the offense.

### Recidivism as an Aggravator

Having determined that petitioner's principal offense was minor, however, does not end the inquiry. Although the focus should be on the seriousness of the principal offense, it is well-established that recidivism is an appropriate consideration in sentencing. Prior convictions may call for a "stiffened penalty for the latest crime, which is considered an aggravated offense because a repetitive one." Witte v. United States, 515 U.S. 389, 400 (1995)(quoting Grygor v. Burke, 334 U.S. 728, 732 (1948)).

The repetitive criminal rationale has long provided a basis upon which to uphold recidivist sentencing schemes against double jeopardy challenges. See, e.g., Graham v. West Virginia, 224 U.S. 616, 624 (1912). It is not, however, simply a wild card that renders any penalty constitutional, however severe its terms and however minor the principle offense. Rather, as explained below, given the strictures of the Double Jeopardy Clause, recidivism may be taken into consideration in the sentencing decision only to the extent that it serves to aggravate the principal offense.

The limitation imposed by the Double Jeopardy Clause takes two forms. First, as the Ninth Circuit observed in Brown, prior convictions cannot aggravate the principal offense if they have no connection with the current offense. Brown, 238 F.3d at 1036. A stiffened penalty is warranted "only if the defendant's current offense involves a repetition of a particular offense characteristic, indicating that the defendant remains prone to that specific kind of antisocial activity." Id.; cf. Witte v. United States, 515 U.S. 389, 399 (1995)("evidence of related criminal conduct to enhance a defendant's sentence for a separate crime . . . does not constitute punishment for that conduct within the meaning of the Double Jeopardy Clause." (emphasis added)).

The Double Jeopardy Clause also imposes a second form of limitation, not addressed by the Ninth Circuit. Regardless of the relationship between the principal offense and prior convictions, those priors can only serve to enhance the punishment for the principal offense to the degree that such offense is susceptible to aggravation. Put differently, some minor offenses will never warrant severe punishment even at their most aggravated. See, e.g., Rummel, 445 U.S. at 274 n.11 (life sentence for hypothetical overtime parking violation would be disproportionate).[14] Thus, when punishment greatly exceeds that warranted by the aggravated offense, it begins to look very much as if the offender is actually being punished again for his prior offenses.

The Supreme Court addressed the potential for this very possibility in reviewing a sentence under California's Three Strikes Law. In Monge v. California, 524 U.S. 721(1998), Justice Scalia observed, "The California Code is full of

'sentencing enhancements' that look exactly like separate crimes, and that expose the defendant to additional maximum punishment."[15] Id. at 739 (Scalia, J. dissenting). As the Supreme Court had observed earlier in the same term, however, a recidivism enhancement cannot be treated as an element of the offense without running afoul of the Double Jeopardy Clause. See Almendarez-Torres v. United States, 523 U.S. 224, 247 (1998)(declining to adopt a rule that a recidivism enhancement significantly increasing the sentence would be considered an element of the offense). Thus, when considering a recidivism enhancement under Three Strikes, the Monge Court did not adopt a per se rule that any recidivist enhancement that increased the maximum sentence should be viewed as an element of the offense. Monge, 524 U.S. at 728-29. Rather, it reviewed the recidivist enhancement at issue to determine whether, as applied, it fell within a "constitutionally permissible" range such that it "did not place petitioner in jeopardy for an 'offense.'" Id. at 729.

Monge provided a clear reminder to courts reviewing sentences imposed under Three Strikes that the Double Jeopardy Clause circumscribes the relevance of recidivism. Under this limitation, petitioner's recidivism cannot be viewed as bearing such weight that the inference of gross disproportionality is weakened. First, under the authorities outlined in Brown, 283 F.3d at 1035-36, petitioner's prior kidnapping convictions cannot serve to aggravate his possession of 1.55 grams of heroin. That petitioner was convicted of simple possession of heroin in no way indicates that "the former punishment [for petitioner's kidnapping offenses] ha[d] been inefficacious in doing the work of reform for which it was designed," nor has it "evidenced a depravity, which merits greater punishment. . .." Moore v. Missouri, 159 U.S. 673, 677 (1895)(quoting Plumbly v. Commonwealth, 43 Mass. (2 Met.) 413 1841 WL 3384 (1841)). Petitioner's possession offense completely lacks characteristics in common with his kidnapping convictions, and cannot be "considered an aggravated offense because a repetitive one." Witte, 515 U.S. at 400.

Moreover, even if petitioner's current offense were aggravated by his prior convictions, under the analysis in Monge petitioner's prior convictions do not destroy the inference of gross disproportionality. While the sentence in Monge—double the seven year maximum sentence for using a minor to sell drugs where the offender had previously been convicted of a qualifying felony—was found to be within the constitutionally permissible range, see id. at 729, the inquiry in Monge yields different results in the case at bar. The life sentence at issue here is the most severe sentence available after capital punishment. See Solem, 463 U.S. at 297. As noted, petitioner's possession offense is minor, having no potential for widespread social impact, such as that inherent in distribution offenses. Nor did petitioner's offense threaten to destroy a future generation by involving minors. Given the minor nature of petitioner's offense, it is apparent that petitioner's recidivism could not account for the extreme length of his sentence without breaching the boundaries imposed by the Double Jeopardy Clause. Petitioner's possession of 1.55 grams of heroin, even to the extent it

could be cons
still a passive

According
not destroy th
by the life ser

  **2. Intrajur**
Where de
gross dispro
disputed se
'sentences i
jurisdiction."
U.S. at 292).
compared th
sentence that
also compar
sentences for

As alread
the maximum
first-time offe
years in pris
first-time off
treatment.

Sentences
petitioner are
crimes. Fir
sentence of 25
Second degre
at 762. Volu
years, while a
for rape or for

The fact th
other sentenc
persuasive val
constitutional
to other ap
convincing).

  **3. Interjuri**
Finally, ev
disproportiona
interjurisdictio
sentence to th
same crime in
at 756. Thi
proportionality
Atkins v. Virg

Proportio
[of decen
factors to
pinpoint
objective
legislation

Id. at 2247 (c
of the death pe
petitioner in t
categorical ch
paid to the in
less apt. "Wi
sentence under
with the pena
offense, as
convictions.

As in Ca
uniformly trea
jurisdictions th
allow for a ter

---

14 This example was once dismissed by Justice Scalia as a "'parade of horribles' form of argumentation." See Harmelin, 501 U.S. at 986 n.11 (Scalia, J., concurring). California's Three Strike, however, has demonstrated that Justice Scalia's imagination failed him in this instance. There is little to distinguish the parking violation example from the real-life parade of horribles that has emerged from the statute at bar. See, e.g., Andrade, 270 F.3d 743 (petitioner sentenced to life in prison for theft of videotapes worth $153.54); Riggs v. California, 119 S.Ct. 890, 891 (1999)(dissent from denial of certiorari)("motivated by homelessness and hunger," petitioner stole a bottle of vitamins and was sentenced to life in prison).

15 Remarkably, the California Supreme Court has construed the recidivism enhancement imposed by Three Strikes in terms very similar to those used by Justice Scalia in Monge, supra. Unwilling or unable to maintain the fiction that California's recidivism enhancements correspond to an aggravated principal offense, the state's high court has explained, "'the purpose of section 667.71 is not to punish especially aggravated instances of a particular crime,' but to 'serve[] the same purpose as the Three Strikes' law, which is to punish recidivism.'" People v. Murphy, 25 Cal.4th 136, 155 (2001)(emphasis in the original) (citing People v. Benson, 18 Cal.4th 24, 34 (1998)).

c exactly like separate
fendant to additional
(Scalia, J. dissenting).
:d earlier in the same
ment cannot be treated
t running afoul of the
ıdarez-Torres v. United
clining to adopt a rule
ficantly increasing the
ement of the offense).
m enhancement under
not adopt a per se rule
that increased the
d as an element of the
). Rather, it reviewed
determine whether, as
lly permissible" range
er in jeopardy for an

ır to courts reviewing
ikes that the Double
:levance of recidivism.
recidivism cannot be
the inference of gross
, under the authorities
ı-36, petitioner's prior
ve to aggravate his
That petitioner was
f heroin in no way
ment [for petitioner's
ficacious in doing the
:signed," nor has it "
greater punishment. . .
5, 677 (1895)(quoting
:s. (2 Met.) 413 1841
possession offense
i common with his
it be "considered an
ive one." Witte, 515

current offense. were
under the analysis in
s do not destroy the
While the inference in
iximum sentence for
re the offender had
ualifying felony—was
lly permissible range,
yields different results
e at issue here is the
: capital punishment.
s noted, petitioner's
ng no potential for
as that inherent in
ner's offense threaten
olving minors. Given
se, it is apparent that
:ount for the extreme
ching the boundaries
Clause. Petitioner's
even to the extent it

Court has construed the
rikes in terms very similar
ng. Unwilling or unable to
recidivism enhancements
, the state's high court has
s not to punish especially
but to 'serve[] the same
is to punish recidivism.'"
)(emphasis in the original)
998)).

could be considered aggravated by his criminal history, was
still a passive, minor offense.

Accordingly, I find that petitioner's prior convictions do
not destroy the inference of gross disproportionality created
by the life sentence imposed for his offense.

2. Intrajurisdictional Comparison

Where defendant's sentence presents an inference of
gross disproportionality, "we must assess whether the
disputed sentence is excessive when compared to
'sentences imposed on other criminals in the same
jurisdiction.'" Andrade, 270 F.3d at 761 (citing Solem, 463
U.S. at 292). In making this analysis, the Ninth Circuit
compared the sentence under Three Strikes with the
sentence that would be received by a first time offender and
also compared the sentence under Three Strikes to
sentences for other crimes. See id.

As already noted, at the time petitioner was sentenced,
the maximum possible sentence that could be imposed on a
first-time offender for simple possession of heroin was three
years in prison. Currently, absent aggravating factors, a
first-time offender would receive probation and drug
treatment.

Sentences of comparable severity to that imposed on
petitioner are ordinarily imposed for much more serious
crimes. First degree murder may be punishable by a
sentence of 25 years to life. See Andrade, 270 F.3d at 761.
Second degree murder is punishable by 15 years to life. Id
at 762. Voluntary manslaughter is punishable by up to 11
years, while a sentence of no more than 8 years is imposed
for rape or for sexual assault on a minor. Id.

The fact that petitioner's sentence may be comparable to
other sentences imposed under Three Strikes is of no
persuasive value in this analysis. See id. (attempt to justify
constitutionally suspect application of a statute by pointing
to other applications of the same statue less than
convincing).

3. Interjurisdictional Comparison

Finally, where there is an inference of gross
disproportionality, the court must conduct an
interjurisdictional comparison, that is, compare petitioner's
sentence to the sentences imposed for commission of the
same crime in other jurisdictions. See Andrade, 270 F.3d
at 756. This is perhaps the most significant stage of
proportionality review. As the Court recently explained in
Atkins v. Virginia, 122 S.Ct. 2242 (2002):

Proportionality review under . . . evolving standards
[of decency] should be informed by "'objective
factors to the maximum possible extent.'" We have
pinpointed that the "clearest and most reliable
objective evidence of contemporary values is the
legislation enacted by the country's legislatures."

Id, at 2247 (citations omitted)(considering the application
of the death penalty to the mentally retarded). Although the
petitioner in this case does not bring the same sort of a
categorical challenge considered in Atkins, the deference
paid to the interjurisdictional comparison in Atkins is no
less apt. With this in mind, I consider the petitioner's
sentence under California's Three Strikes law as compared
with the penalties available in other states for the same
offense, as aggravated by petitioner's kidnapping
convictions.

As in California, simple possession of heroin is
uniformly treated as a relatively minor offense. Eighteen
jurisdictions (seventeen states and the federal government)
allow for a term of no more than two years for the offense,

absent enhancements.[16] Sixteen jurisdictions allow for a
term of more than two, but not more than five years, absent
enhancements.[17] Of the remaining jurisdictions, only
Colorado and Georgia allow for sentences in excess of ten
years.[18] See Colo. Rev. Stat. §§ 18-18-405, 18-1-105 (4-12
years); Ga. Code Ann. § 16-13-30 (2-15 years).

Unlike California, however, most jurisdictions'
recidivist sentencing schemes are in keeping with the
notion that possession of heroin is a relatively minor
offense. In twenty-one jurisdictions, a simple possession
offense is not deemed to be aggravated by recidivism at all.
These jurisdictions would categorically except petitioner's
offense from recidivist sentencing enhancements.[19]

---

16    These jurisdictions are:

Alaska Stat. §§ 11.71.040,12.55.125 (1 year); Ark. Code Ann.
§§ 5-64-401, 5-4-401 (up to one year); Del. Code Ann. tit. 16
§ 4754, tit. 11 § 4206 (6 months); Ind. Stat. §§ 35-48-4-7, 35-
50-2-7 (1 1/2 years); Iowa Code Ann. §§ 124.401, 903.1 (up
to 1 year); Kan. Stat. Ann. §§ 65-4162, 21-4502 (up to 1
year); Mass. Gen. Laws ch. 94C § 34 (up to 2 years); N.
M. Stat. Ann. §§ 30-31-23, 31-18-15 (18 months); N.Y. Penal
Law §§ 220.03, 70.15 (up to 1 year); Ohio Rev. Code Ann. §§
2925.11, 2929.14 (6-12 months); Pa. Cons. Stat tit. 35 § 780-
113 (up to 1 year); S.C. Code Ann. § 44-53-370 (up to 2
years); Tenn. Code Ann. §§ 39-17-418, 40-35-111 (up to 11
months and 29 days); Utah Code §§ 58-37-8, 76-3-204 (up to
6 months); W. Stat. tit. 18 § 4233 (up to 1 year); W. Va. Code
§ 60A-4-401 (90 days - 6 months); Wis. Stat. Ann. §
961.41(3g)(up to 2 years); 21 U.S.C.§ 844(a) (up to 1 year).

17    These jurisdictions are:

Ariz. Rev. Stat. Ann. §§ 13-3407, 13-701 (1 1/2 -3 years); Fla.
Stat. Ann. §§ 893.13, 775.082 (up to 5 years); Haw. Rev. Stat.
§§ 712-1243, 706-660 (up to 5 years); Illinois Comp. Stat. ch.
720 § 570/402, ch. 730 § 5/5-8-1 (1-3 years); Ky. Rev. Stat.
Ann. §§ 218A.1415, 532.060 (1-5 years); Me. Rev. Stat. Ann.
tit. 17A §§ 1107, 1252 (up to 5 years); 2002 Md. Sess. Laws
Ch. 26 § 5-601 (up to 4 years); Minn. Comp. Laws Ann. §
333.7403 (up to four years); Minn. Stat. Ann. § 152.025 (up to
5 years); Mont. Code Ann. §§45-9-102 (up to 5 years); Neb.
Rev. Stat. §§ 28-416, 28-105 (up to 5 years); Nev. Rev. Stat.
§§ 453.336, 193.130 (1-4 years); N.J. Stat. Ann. §§ 2C:35-10,
2C:44-1 (4 years); N.D. Cent. Code 19.03.1-23, 12.1-32-01
(up to 5 years); R.I. Gen. Laws § 21-28-4.01 (up to 3 years);
Wash. Rev. Code § 69.50.401 (up to 5 years).

18    These remaining jurisdictions are:

Ala. Code §§ 13A-12-212, 13A-5-6 (1-10 years); Conn. Gen.
Stat. Ann. §§ 21a-279 (up to 7 years); Idaho Code § 37-2732
(up to 7 years); La. Rev. Stat. § 40:966 (4-10 years); Miss.
Code Ann. § 41-29-139 (2-8 years); Mo. Ann. Stat. §§
195.202, 558.011 (up to 7 years); N.H. Rev. Stat. Ann. §§
318:B:26, 651:2 (up to 7 years); N.C. Gen. Stat. §§ 90-95,
15A-1340.17(c)and (d) (presumptive range of 4-6 years
minimum duration, 5-8 years maximum duration); Okla. Stat.
tit. 63 § 2-402 (2-10 years); Ore. Rev. Stat. §§ 475.992,
161.605 (up to 10 years); S.D. Codified Laws §§ 22-42-5, 22-
6-1 (up to 10 years); Tex. Health & Saf. Code § 481.115, Tex.
Penal Code § 12.34 (2-10 years); Vt. Stat. Ann. §§ 18.2-250,
18.2-10 (1-10 years); Wyo. Stat. § 35-7-1031 (up to 7 years).

19    In thirteen jurisdictions, possession of heroin is a misdemeanor and,
as such, not subject to recidivist sentencing. See Ark. Code Ann. §§ 5-
64-401(c), 5-4-501; Del. Code Ann. tit. 16 § 4754, tit. 11 § 4214; Iowa
Code Ann. §§ 124.401, 902.8; Kan. Stat. Ann. §§ 65-4162, 21-4504;
2002 Md. Sess. Laws ch. 26 §§ 5-601, 14-101(c)(d)and (e); N.Y. Penal
Law §§ 220.03, 70.08; Pa. Cons. Stat tit. 35 §780-113.1, tit.42 § 9714;
S.C. Code Ann. §§ 44-53-370, 17-25-45; Tenn. Code Ann. §§ 39-17-
418, 40-35-106; Utah Code §§ 58-37-8, 76-3-203.5; Vt. Stat. tit. 18 §
4233, tit 13 § §1, 11, 11a; W. Va. Code §§ 60A-4-401, 61-11-18; 21
U.S.C. § 844, 18 U.S.C. § 3559(a)(6).

In eight jurisdictions, recidivist sentencing schemes are reserved for
enumerated serious or violent felonies and/or minor drug crimes are
excepted from the recidivist sentencing scheme. See Conn. Gea. Stat.

**Daily Appellate Report** Tuesday, November 12, 2002

The jurisdictions that do provide for some type of sentencing enhancements for prior convictions generally operate under recidivist statutes that are much more limited than California's Three Strikes. For example, where, in California, petitioner's sentence was enhanced by virtue of two convictions arising out of the same kidnapping incident, many states' recidivist laws count only convictions arising out of separate incidents.[20] Similarly, in New Mexico, a recidivist enhancement will not be imposed unless the offender has suffered at least three prior felony convictions. See N.M. Stat. Ann. § 31-18-17 (requiring at least three prior convictions before an enhancement of 8 additional years may be imposed). Thus, in one-third of the jurisdictions in which simple possession can be aggravated by prior convictions, petitioner's kidnapping convictions would not serve to aggravate his possession offense.

Finally, nearly all of the remaining jurisdictions in which petitioner's kidnapping conviction would trigger enhancements provide for much lower maximum enhanced sentences than the minimum mandated by Three Strikes and/or much earlier parole eligibility.[21] Among these states,

Ann. § 53a-28; Fla. Stat. Ann. § 775.084; Minn. Stat. Ann. § 609.1095; Ohio Rev. Code Ann. §§ 2929.11, 2929.14; Ore. Rev. Stat. § 161.725; Va. Code Ann. § 19.2-297.1; Wash. Rev. Code §§ 9.94A.120, 9.94A; Wyo. Stat. 6-10-201.

20  See Colo. Rev. Stat. § 16-13-101; Haw. Rev. Stat. § 706.606.5, State v. Cornelio, 935 P.2d 1021 (Haw. S. Ct. 1997); Ind. Code § 35-50-2-8; Miss. Code Ann. § 99-19-83; Mo. Ann. Stat. § 558.016; N.H. Rev. Stat. Ann. 651:6; N.J. Stat. Ann. 2C:44-3, 2C:43-7; R.I. Gen. Laws § 12-19-21: 2; Tex. Health & Saf. Code § 481.115(b); Tex. Penal Code § 12.42.

21  The following jurisdictions provide for much lower maximum sentences, many of which are further mitigated by the availability of good time credits and parole:

Alaska Stat. §§ 12.55.125, 12.55.145(a)(1)(C)(since two priors not separate, 2 years); Ariz. Rev. Stat. § 13-604 (8-12 years); 720 Ill. Comp. Stat. § 570/402l(c), 730 Ill. Comp. Stat. §§ 5/5-5-3.2, 5/5-8-2 (3-6 years); Ky. Rev. Stat. Ann. § 532.080; § 532.060 (2 priors out of same incident count as one prior, so enhanced sentencing range of 5-10 years); Me. Rev. Stat. Ann. tit.17-A §§ 1252, 1253 (enhanced sentence of up to 10 years, reduced by good time credit of ten days per thirty days); Mass. Gen. Laws Ann. ch. 94C § 34 (enhanced to statutory maximum of 1 year); Mich. Comp. Laws. Ann. § 769.11; People v. Wright, 437 N.W.2d 603 (Mich. Ct. App. 1989) (enhanced to double the statutory maximum of 4 years; minimum term cannot be more than 2/3 the maximum); N.C. Gen. Stat. § 14-7.1, 15A-1340.14 (since 2 priors not separate, not recidivist enhancement; rather, in light of priors, sentencing range of 8-10 months); N.D. Cent. Code §§ 12.1-32-09, 12-54.1-01 (up to 10 years reduced by good time credit of five days per month); Wis. Stat. Ann. 939.62, 304.06 (maximum 2 year sentence may be enhanced to up to 6 years, with parole eligibility after 25% of the sentence served).

Even in the minority of jurisdictions where the enhanced sentencing range gives the courts discretion to apply severe penalties, nearly all mandate an early parole-eligibility date:

Ala. Code §§ 13A-5-6, 13A-5-9;15-22-28, 15-22-27 (enhanced sentencing range of 10-99 years; parole eligible after 1/3 of sentence or 10 years, whichever less); Ga. Code Ann. § 17-10-7 (with prior, judge must give maximum sentence of 15 years, but has discretion to probate or suspend the maximum; presumptive parole after 1/3 sentence); La. Rev. Stat. §§ 15:529.1, 574.4, State v. Francis, 709 So.2d 834 (La. Ct. App. 1998) (2 priors subject to the same prosecution count as one; enhanced sentencing range between 5-20 years; parole eligible after ½ sentence); Nev. Rev. Stat. § 207.010.2; § 213.120 (with two priors, enhanced sentencing range of 5-20 years; parole eligible after 1/3 sentence); 2002 Okla. Sess. Laws ch. 455 section1(A)(2), (C)(2) (amending 21 Okla. Stat. tit. 21 51.1); Okla. Stat. tit. 57, 332.7 (since priors not separate, enhanced sentencing range of twice the minimum, i.e. 8 years,

the greatest length of time that petitioner would have to serve before he would be eligible for release or for parole is ten years. In only Idaho, Montana, and Nebraska do judges appear to have discretion to impose a sentence for which the offender must serve time comparable to the twenty-five year minimum that is required under Three Strikes.[22] In contrast with the enhancement imposed under Three Strikes, however, the prescribed minimum in these three jurisdictions is quite low. See note 22, supra.

In sum, in thirty one jurisdictions, petitioner's kidnapping convictions would not have triggered enhanced sentencing for his possession conviction at all. Moreover, even taking into account the twenty jurisdictions where petitioner's sentence would have been enhanced, no jurisdiction outside of California would mandate a sentence of greater than 15 years for petitioner. In the one jurisdiction that would mandate a 15 year sentence, the judge has discretion to suspend the maximum, and parole is available after five years. See Ga Code Ann. § 17-10-7. More importantly, with the exceptions of Idaho, Montana and Nebraska, in no jurisdiction outside of California does a court have discretion, much less a mandate, to require petitioner to serve more than ten years before he is eligible for release or for parole.

The inference that petitioner's life sentence is grossly disproportionate is fully supported.

## ● REASONABLENESS IN LIGHT OF CLEARLY ESTABLISHED SUPREME COURT LAW

Having found that the petitioner's sentence is grossly disproportionate to his offense, I also find that the state court's decision was contrary to or an unreasonable application of clearly established Supreme Court precedent.

The general analytic framework for reviewing a sentence for proportionality was clearly established at the time that petitioner's sentence was finally reviewed by the California courts in 1999. See Andrade v. Attorney General of the State of California, 270 F.3d 743, 766 (9th Cir. 2001)("[T]he law governing the application of the Eighth Amendment to non-violent offenders sentenced to life imprisonment was clearly established by the time of the Court of Appeal's 1997 decision in this case"). Even assuming, arguendo, that the fractured decision in Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) provided enough ambiguity in the law that states could simply claim ignorance and run roughshod over the Eighth Amendment, by the time that the California Court of Appeals reviewed petitioner's sentence the Supreme Court had reiterated the point made by Justice Kennedy in Harmelin: Solem's gross disproportionality standard governed. See Bajakajian, 524 U.S. at 336-37 (1998); see also id. (opinion of Kennedy, J., for the dissenters, agreeing that the majority had applied the appropriate standard). Indeed, in citing to People v. Cartwright, 39 Cal.App.4th 1123 (1996), a case analyzing a sentence for gross disproportionality, it appears that the California Court of Appeals recognized as much.

to life; parole eligible after the lesser of 1/3 sentence or ten years); S.D. Codified Laws §§ 22-7-7, 22-6-1; 24-5-1 (priors allow enhancement up to 15 years; parole eligible after ½ the sentence, reduced by "good time").

22  See Idaho Code §§ 19-2514, 19-2513 (with two priors, enhanced sentencing range of 7 years to life; minimum sentence must be specified, after which petitioner is parole eligible); Mont. Code Ann. §§ 46-18-501; 46-18-502; 46-23-201 (conviction within 5 years of punishment for a prior results in enhanced sentencing range of 5-100 years; discretion to suspend sentence in excess of 5 years; parole eligibility after 1/4 sentence); Neb. Rev. Stat. § 29-2221; §§ 83-170, 83-1, 110 (with two priors, enhanced sentencing range of 10-60 years; parole eligible after 1/2 minimum sentence minus "good time").

Tuesday,

Also cl was revie double je considered current of than a cer 677 (189 contempor disproport U.S. 277, Supreme sentence i operating Monge v.

Given Amendme Court of constitutio establishe Court of A to apply application impose the recidivism offense," principal clearly fai the strictu only relev aggravates applied th inference life senten confirmed compariso

Petition GRANTED RESENTE Eight Am IT IS S DATE

Court: Unitec for the

Opinion fil Octobe

Judge: Before

Attorneys: Rachell Assist Office of 801 K S Sacram For petitio

Clifford Deput

ioner would have to
lease or for parole is
t Nebraska do judges
t sentence for which
ble to the twenty-five
Three Strikes.[22]  In
posed under Three
mum in these three
supra.
ictions, petitioner's
e triggered enhanced
on at all. Moreover,
jurisdictions where
been enhanced, no
l mandate a sentence
ioner.  In the one
5 year sentence, the
kimum, and parole is
>de Ann. § 17-10-7.
s of Idaho, Montana
le of California does
mandate, to require
before he is eligible

sentence is grossly

HT OF CLEARLY
LAW
'sentence is grossly
> find that the state
or an unreasonable
me Court precedent.
reviewing a sentence
shed at the time that
ved by the California
>rney General of the
13, 766 (9th Cir.
cation of the Eighth
s sentenced to life
by the time of the
this case").  Even
decision in Harmelin
91) provided enough
:ould simply claim
Eighth Amendment,
of Appeals reviewed
urt had reiterated the
nelin: Solem's gross
See Bajakajian, 524
inion of Kennedy, J.,
ority had applied the
citing to People v.
)6), a case analyzing
', it appears that the
l as much.

[footnote]
' 1/3 sentence or ten
2-6-1; 24-5-1 (priors
e eligible after ½ the

ith two priors, enhanced
ntence must be specified,
Code Ann. §§ 46-18-501
ears of punishment for a
5-100 years; discretion to
ole eligibility after 1/4
70, 83-1, 110 (with two
ears; parole eligible after

---

Also clearly established at the time petitioner's sentence was reviewed was the rule that, due to the prohibition on double jeopardy, recidivism may only be constitutionally considered in sentencing to the extent that it aggravates the current offense.  This rule has been established for more than a century, see, e.g., Moore v. Missouri, 159 U.S. 673, 677 (1895), and has been reiterated in the Supreme Court's contemporary jurisprudence concerning gross disproportionality challenges.  See Solem v. Helm, 463 U.S. 277, 296 n.21 (1983).  If that were not enough, the Supreme Court applied this rule to determine whether a sentence imposed under the very same recidivist statute operating in this case constituted double jeopardy.  See Monge v. California, 524 U.S. 721, 729 (1998).

Given its terse treatment of petitioner's Eighth Amendment challenge, it is impossible to say whether the Court of Appeals recognized and endeavored to apply the constitutional limitation on the relevance of recidivism established by these cases.  Whatever the rationale of the Court of Appeals, its decision was either an outright failure to apply the applicable precedent or an unreasonable application thereof.  The sentencing court's decision to impose life imprisonment focused wholly on petitioner's recidivism.  Not only did it fail to "focus on the principal offense," Solem 463 U.S. at 296 n.21, it gave petitioner's principal offense no consideration whatsoever.  Thus, it clearly failed to observe the principle that, in keeping with the strictures of the Double Jeopardy Clause, recidivism is only relevant to enhance a sentence to the extent that it aggravates the principal offense.  Had the Court of Appeals applied this rule on review, it could not have ignored the inference of gross disproportionality created by imposing a life sentence for simple possession of heroin--an inference confirmed by the intrajurisdictional and interjurisdictional comparisons it should have made.

III.

CONCLUSION

Petitioner's application for a writ of habeas corpus is GRANTED.  Within thirty (30) days, the State shall RESENTENCE petitioner in a manner consistent with the Eight Amendment, as explained in this opinion.
IT IS SO ORDERED.
DATED:  November 11, 2002.

LAWRENCE K. KARLTON
Senior Judge
United States District Court


Court:
United States District Court
for the Eastern District of California

Opinion filed:
October 18, 2002

Judge:
Before Senior U.S. District Judge Lawrence K. Karlton

Attorneys:
Rachelle Barbour,
Assistant Federal Defender
Office of the Federal Defender
801 K Street, 10th Floor
Sacramento, CA  95814,
For petitioner.

Clifford Zall,
Deputy Attorney General

---

Office of the Attorney General
Department of Justice
1300 I Street
Sacramento, CA  95814,
For respondent.

**EXHIBIT . . . . . . B**

Frederick Gatlin (P-19908)

California Medical Facility (P-141-Low)

P.O. Box 2000

Vacaville, California 95696-2000

<u>IN PRO SE</u>

**COPY**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| FREDERICK GATLIN | ) | <u># C-07-3696-CW (pr)</u> |
| Petitioner | ) | |
| -v- | ) | OPPOSITION TO RESPONDENTS MOTION |
| | | <u>TO DISMISS HABEAS CORPUS WRIT</u> |
| JAMES E. TILTON | ) | |
| Respondent | ) | |
| | ) | |

TO <u>HON. CLAUDIA WILKENS</u> (DISTRICT JUDGE):

〔●●●●●●●●●〗●●●●●●●●〗

(<u>I</u>) <u>PRO SE STANDARD & LEGAL ASSISTANCE</u>:

   Petitioner suffers from a mental disorder and is currently on psych-meds and counseling therapy for treatment of his desease. Due to petitioner not understanding the nature of these proceedings and having the inability to submit pleadings before the court, another prisoner is assisting petitioner to file papers before the court per, <u>U.S. Const., Amend. 1</u>; <u>Johnson v. Avery</u>, 393 US 483, 490 (1969) and <u>Rizzo v. Dawson</u>, 778 F2d 527, 531 (9th Cir,1985). Legal assistance is being rendered by another prisoner to access the courts per, <u>Lewis v. Casey</u>, 518 US 343, 349-350 (1996) and <u>Bounds v. Smith</u>, 430 US 817, 828 (1977).

Due to petitioner not being an attorney, the court is moved to hold pro se pleadings in deference, see; Maleng v. Cook, 490 US 488, 493 (1989); Belgarde v. Montana, 123 F3d 1210, 1213 (9th Cir,1997).

Due to petitioner not being an attorney, the court is moved to liberally construe pro se pleadings, see; Boag v. MacDougall, 454 US 364, 365 (1982); Eldridge v. Block, 832 F2d 1132, 1134-1136 (9th Cir,1987).

Due to petitioner not being an attorney, the court is moved to hold pro se pleadings to a lesser stringent standard, see; Haines v. Kerner, 404 US 519, 520 (1972); Ashelman v. Pope, 793 F2d 1072, 1078 (9th Cir,1986)(en banc).

/////////
/////////

(II) EQUITABLE TOLLING DUE TO EXENUATING CIRCUMSTANCES:

(a) TOLLING DUE TO STANDARD OF REVIEW:

In pertinent part, the statute reads, "A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgement of a State court. The limitation period shall run from; the date on which the judgement became final by the conclusion of direct review or the expiration of the time for seeking such review; the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action; the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by Supreme Court and made retroactively applicable to cases on collateral review, or; the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence, see; 28 USC 2244(d)(1)(A)-(D);

-2-

Calderon v. USDC (Beeler), 128 F3d 1283, 1287 n.3 (9th Cir,1997), overruled on other grounds, Calderon v. USDC (Kelly), 163 F3d 530, 540 (9th Cir,1998)(en banc).

In most cases, the limitation period begins running on the date that a petitioners direct review becomes final, see Bowen v. Roe, 188 F3d 1157, 1158-1159 (9th Cir,1999); Patterson v. Stewart, 251 F3d 1243, 1246 (9th Cir,2001).

The statute further permits tolling when a proper state writ is filed after the state appeal for exhaustion to federal review, it reads; "(T)he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgement or claim is pending shall not be counted toward any period of limitation under this subsection, see 28 USC 2244(d)(2); the statute of limitations is tolled where a petitioner is,properly pursuing post-conviction relief-the period is tolled during the intervals betwen one state courts disposition of a habeas petition and the filing of a habeas petition at the next level of the court system, Carey v. Saffold, 536 US 214, 219-221 (2002) and Nino v. Galaza, 183 F3d 1005, 1005-1006 (9th Cir,1999); an additional 30-days is afforded for tolling after the California Supreme Court denial when filing in federal district courts, see; Bunney v. Mitchell, 262 F3d 973, 974 (9th Cir,2001).

## (b) TOLLING DUE TO ATTORNEY ERROR:

Petitioner suffers from a mental disorder (i.e. NOTE: See (EX#A) for , lengthy list of mental disorders & diseases within the record... ) and takes the following psych-medications for his mental diseases such as: (i.e. NOTE: See (EX#A) for lengthy list of medications & treatment... ).

This petitioner is unable to understand or appreciate the nature of the legal court system and does not have the ability to file pleadings for himself. As noted on pp.1 of the ("motion"), petitioner is being assisted by another prisoner to present papers, Johnson, supra, 393 US at 490.

. Counselor held onto petitioners trial-transcripts since his conviction in (1998) and until this date petitioner has never received a copy of his transcripts from either the attorney or the state court to comb the record for constitutional errors at trial or on appeal so that pleadings or claims may be presented to the court.

The lawyer during the trial or on appeal never informed petitioner of any certiorari writ appeals to the U.S. Supreme Court after being denied review by the state supreme court; nor was petitioner informed of filing any federal habeas corpus writ petition within the 1-year to the federal courts and this petitioner was simply told by attorney that his case was over and had ended.

The court may take into consideration the mental incompentency of a petitioner when deciding tolling, Calderon v. USDC (Kelly), 163 F3d 530, 541 (9th Cir,1998)(en banc); the (GAF) sore of an individual/petitioner psychological, social and occupational functioning may be considered by the court for tolling, see Vargas v. Lambert, 159 F3d 1161, 1164 n.2 (9th Cir,1998).

Petitioner move the court to grant ("tolling") due to counselors actions cauding the default or late filing when counselor held onto to legal files and transcripts for over 6-years and to date still has not forward materials to petititioner; and when counsel failed to inform petitioner of any federal court filings under 28 USC 2244 & 2254 (i.e. habeas corpus) after state review ended. The court is deferred to caselaws, Spitsyn v. Moore, 345 F3d 796, 800 (9th Cir,2003)(e.g. the court found that a petitioners attorneys conduct was sufficiently egregious to warrant equitable tolling); Miles v. Prunty, 187 F3d 1104, 1107 (9th Cir,1999)(e.g. when external forces rather than a petitioners lack of diligence, account for the failure to file a timely claim, equitable tolling of the statute of limitations may be appropriate); Lott v. Mueller, 304 F3d 918, 920-925 (9th Cir,2002)(e.g. finding that equitable tolling may exist when a petitioner does not have access to his legal files to file claims); Stillman v. Lamarque, 319 F3d 1199, 1203 n.6 (9th Cir,2003)(e.g.

finding that there are instances in which an attorneys failure to protect his client interest is so egregious and atypical that the court may find equitable tolling appropriate, but regular instance of attorney negligence do not entitle to tolling).

Petitioner move the court for equitable tolling due to attorneys actions which caused the default.

(c) TOLLING DUE TO MENTAL DISEASE/DISORDERS:

Petitioner suffers from a mental disorder (i.e. NOTE: See (EX#A) for lengthy list of mental disorders & diseases within the record...             )

and takes the following psych-medications for his mental diseases such as: (i.e. NOTE: See (EX#A) for lengthy list of medications & treatment...           ).

The supreme court has stated that ("tolling") is available under the AEDPA 28 USC 2254 amended habeas law, see; Lawrence v. Florida, 127 SCt 1079, 1085 n.3 (2007); the supreme court has also held that a state habeas petition to be properly filed for the purposes of statutory tolling, the petition must be delivered in compliance with laws or rules for habeas filings, Pace v. DiGuglielmo, 544 US 408, 413 (2005); Bonner v. Carey, 425 F3d 1145, 1148 (9th Cir,2005).

It is contended that petitioners mental condition (i.e. disease/disorder) prevented him from filing any habeas actions and/or direct appeals within the courts and that either state appointed lawyers during appeal and state prisoners during habeas corpus review had to file papers or pleadings with the court to adjudicate the claims due to petitioner being unable to file anytype of pleadings within the court, see; Laws v. Lamarque, 351 F3d 919, 922-924 (9th Cir,2003)(e.g. disucssing mental illness as grounds for equitable tolling and remanding the case for further development of the factual record); Calderon v. USDC (Kelly), 163 F3d 530, 541 (9th Cir,1998)(en banc)(e.g. finding petitioners mental incompetency rendered him unable to assist his at-

torney in the preparation of his petition). Petitioner has a below average
psych-medical (GAF) score displaying his mental disorder, see (EX#A) and cf,
Vargas v. Lambert, 159 F3d 1161, 1164 n.2 (9th Cir,1998)(e.g. A GAF score
is a rough estimate of a petitioners psychological, social and occupational
functioning in which a federal court may use for determining equitable tol-
ling due to mental deficiency preventing timely filing by defendants).

When the courts determine equitable tolling is justified or warranted, it
is based on a fact-specific inquiry, see Frye v. Hickman, 273 F3d 1144, 1146
(9th Cir,2001). Please judicial notice per Fed.R.Evid. 201 attached (EX#A).

As noted, petitioner is unable to file any pleadings within state or fede-
ral courts and is being assisted by another inmate in presenting pleadings.
The court is moved to order an ("evidentiary hearing") per 28 USC 2254(e)
to establish the factual record on mental disability claim for equitable tol-
ling, see; Laws v. Lamarque, 351 F3d 919, 922-924 (9th Cir,2003).

An evidentiary hearing on a claim is required when it is clear from the
petition that: (1) the allegations if established would entitle petitioner
to relief, (2) the state court trier of fact has not reliably found the re-
levant facts, see; Rich v. Calderon, 187 F3d 1064, 1067-1068 (9th Cir,1999);
Turner v. Calderon, 281 F3d 851, 890 (9th Cir,2002) and Karis v. Calderon,
283 F3d 1117, 1126-1127 (9th Cir,2002).

Petitioner states a claim for equitable tolling due to mental deficiency,
the respondents ("Motion to Dismiss") does not dispute any of the facts or
laws of the cases presented herein and only makes naked bone assertions that
due to the federal writ petition being filed 6-years late, petitioner is time
barred, see Motion to Dismiss at pp.1-3. The respondent only presents aghastly
a 2-page argument for dismissal in which the court should reject and allow
the petition to proceed.

# C O N C L U S I O N

Petitioner move the court to grant ("equitable tolling") due to attorneys causing the default by failing to turn over any of the transcripts and legal files for state/federal habeas corpus filing and due to failing to inform petitioner of the pursuit of federal court relief if state court relief is denied.

The court is further moved for tolling due to mental incompentency, disorder, disease, and disability thus preventing petitioner from filing any pleadings within the courts. Petitioner is being assisted by another inmate.

Finally, the court is moved to appoint counsel and order an evidentiary hearing to develop facts for the records to determine equitable tolling. The court is also moved to deny the respondents motion to dismiss and to allow the Answer-Briefs and Traverse-Briefs to be filed for full adjudication of the case.

///


///


///

I DECLARE UNDER PENALTY OF PERJURY AND THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE. THIS ACTION WAS EXECUTED ON 11/11/2007 AT VACAVILLE, CA.

FREDERICK GATLIN (Petitioner)

-7-

GATLIN                )        #C-07-3696-CW  (PR)

    -v-              )        DECLARATION/AFFIDAVIT

TILTON                )

_____)


(1) I declare that I (RAYMOND JACKSON SR.) am the declarant/affiant herein
    and reside within the California Department of Corrections & Rehabilita-
    tion at the California Medical Facility., 1600 California Drive (POB 2000),
    Vacaville, CA.


(2) I declare that I am the ("legal assistant") prisoner assisting the
    petitioner Frederick Gatlin in presenting his claims to the courts
    due to petitioners mental disease or disorder which is preventing the
    petitioner from presenting the claims to the courts on his own.


(3) I declare that I am competent to understand some of the dynamics of
    the (ISL) Indeterminate Sentence Law regarding 3-strikes and the (DSL)
    Determinate Sentence Law regarding illegal sentence enhancements and
    have submitted these constitutional claims for the petitioner to the
    courts for adjudication and relief for the petitioner.


I DECLARE UNDER PENALTY OF PERJURY AND THE LAWS OF THE UNITED STATES THAT THE
FOREGOING IS TRUE. THIS DECLARATION AND AFFIDAVIT WAS EXECUTED ON 11/11/2007
AT VACAVILLE, CALIFORNIA.


                                              _R. D. Jackson, Sr._

                                        RAYMOND JACKSON SR.,

                                        (Declarant/Affiant)

# EXHIBIT A

### Jeffrey S. Kline, Ph.D.
## CLINICAL & FORENSIC PSYCHOLOGY
Lic. No. PSY10811

The Bright Eagle Mansion
1040 Noel Drive, Suite 209
Menlo Park, CA  94025
**(650) 329-8904**

### *Forensic Psychological Evaluation*

August 16, 1998

TO:        Jennifer Green
           Deputy Public Defender
           Law Offices
           Office of the Public Defender
           120 West Mission Street
           San Jose, Ca.  95110

RE:        Fredrick John Gatlin
           Municipal Court #E9702658

SUBJECT: Psychodiagnostic Evaluation

Dear Ms. Green,

The following is the report summarizing my evaluation of Mr. Fredrick Gatlin.  I
was initially appointed by the Court on 8/26/97 to conduct an examination of the
mental condition of the defendant for J.J. Kapp, under Evidence Code Section
1017, after he was charged with grand theft auto on 6/11/97.  It is my
understanding that he has been convicted of that offense and is now awaiting
sentencing.  You requested an additional evaluation with psychodiagnostic testing
to establish the extent to which Mr. Gatlin suffers from a mental disorder.


Date of Evaluation:        7/21/98
Place of Evaluation:       Main Jail, San Jose
Duration of Evaluation:  4 hours, 35 minutes

## Records Reviewed

1. U.S. Probation Officer's report, 8/21/97
2. Municipal Court, Santa Clara County, statement of the charges and prior conviction
3. Crime Report, 6/11/97
4. Criminal History Report
5. Santa Clara Valley Medical Center Records of Treatment 6/11/97-7/25/97
6. Main Jail Medical Records, 6/15/97-7/14/97
7. Inmate Grievance Form, 6/18/97
8. 1368 Examination, Douglas Harper, M.D., 2/23/98
9. U.S. District Court Probation Officer Letter, 8/21/97
10. 1368 Examination, Robert Burr, M.D., 3/5/98
11. Sacramento County Department of Health, Main Jail Medical Services Records, 12/11/96, 1/18/97
12. UC Davis Medical Center Records, 5/13/97-6/3/97
13. Mercy General Hospital Records, 5/31/97
14. Santa Clara Valley Medical Center Records, 7/6/94-3/3/98
15. U.S. Department of Justice, Federal Bureau of Prisons Medical Records, 6/29/92-7/29/96
16. Federal Correctional Institution, Terminal Island, Medical Records, 11/19/93-3/25/94
17. John C. Lincoln Hospital Medical Records, 11/1/96
18. Health Services Unit, Federal Correctional Institute, Phoenix, Arizona, 6/15/94-4/29/97
19. Inmate History and Disciplinary Data, 10/14/97
20. Incident Reports, Federal Correctional Institute, Phoenix, Arizona, 6/11/94, 8/6/94, 2/10/95
21. Incident Report, Federal Correctional Institute, Terminal Island, Ca., 1/1/94, 1/19/94
22. Sacramento County Main Jail Medical Records, 2/13/97
23. Federal Medical Center, Rochester, Minnesota, Medical Records, 10/7/93
24. Saratoga Medical Center, Springfield, Virginia, Medical Records, 5/29/96, 6/17/96
25. VA Medical Center, Phoenix, Arizona, Medical Records, 10/29/96
26. Phoenix General Hospital, Medical Records, 8/21/96, 4/18/97

## Consent Advisement & Confidentiality Waiver

Mr. Gatlin was informed of the purpose of this evaluation, that the information gathered will be used for a report to his attorney and the Court, and that the results are not confidential. The defendant acknowledged his understanding of this, his comprehension was good, and he agreed to participate.

## Tests Administered

MMPI-2
Rorschach

## Criminal History

Mr. Gatlin reported an extensive adolescent legal history resulting in juvenile detention on several occasions, although he was unable to remember the specifics. His arrest record indicates that between 1973 and 1993 he has been charged with bank robbery, robbery with use of a firearm, burglary, driving without a license, battery on a peace officer, resisting arrest, receiving stolen property, possession of a controlled substance, vehicle theft, and battery. His Federal probation officer reported that Mr. Gatlin has also been arrested multiple times for petty theft while under Federal supervision. He has been in prison 3 times.

## Mental Health, Psychiatric & Substance Abuse History

Mr. Gatlin denied a history of psychiatric hospitalizations but said that he has been treated with psychiatric medications as an outpatient. He could not remember the names of the medications. During the initial 1017 evaluation conducted by this evaluator (September 1997), Mr. Gatlin reported that while he lived with his mother in 1990 he became "very, very religious" and he had visual hallucinations of "demons" in his room with whom he would fight. He had several of these episodes in 1990 which were transient and lasted for about 10-15 minutes. During the same period he said that he experienced 2-3 day periods of sleeplessness and hyperactivity. He also reported a long history of odd experiences such as people and objects suddenly disappearing, talking to trees that he said had faces and souls, and one time opening a door and feeling a stab on his neck when no one was there. During the current evaluation Mr. Gatlin reported two other occasions in which he experienced transient psychotic-like episodes and denied co-occurring



J. Kline, Ph.D.
Gatlin Evaluation
Page 3 of 9

substance intoxication. One was when he lived in Louisiana and a girlfriend would not let him back into her apartment at night. He said that he "sat there three or four hours until day light and felt all kinds of things being pulled out of me, like something was being drawed out of me." The other incident occurred in May of 1997 while he was living with his brother and lasted about 20 minutes. He said that "all of a sudden I felt like I was being controlled by everything...like something being pulled out of my right arm...I believed God was pulling all kinds of demons out of me...the last one was not pulled out and a voice came out of me...a demon...and said you would not take me out until judgement day." Mr. Gatlin related the latter incident in the midst of reporting his history of being sexually abused in the form of anal penetration (described below).

Mr. Gatlin said that he was treated with counseling in prison for depression for about 7 months in 1993. His depression was precipitated by his mother's deteriorating health. He has a history of incarceration at the Vacaville Medical Facility in 1977 but there were no records from this facility available for this evaluation.

The records indicate that Mr. Gatlin has been diagnosed in the past with major depression (1993) with at least three suicide attempts, schizoaffective disorder versus paranoid schizophrenia versus bipolar disorder (1993, 1994), anxiety reaction (1994), dysthymic disorder (1994), and bipolar disorder in the hypomanic phase (1997). The records document that Mr. Gatlin reported a history of auditory and visual hallucinations. Symptoms that he has presented with include suicidal ideation, confusion, illusions, delusions, auditory hallucinations with paranoid content, and pressured and expansive speech. He has been treated with antipsychotic (Haldol, Stelazine) and antidepressant medications (Prozac, Imipramine). The mental disorder symptoms that have been documented in the past are complicated by a co-occurring seizure disorder and appear to be relatively short-lived. The records also indicate that he has episodes of pseudo-seizures. At the time of this evaluation he was taking valproic acid for his seizure disorder and Elavil which is an antidepressant.

In January of 1997 while at a Federal halfway house in Sacramento he was found running naked through the neighborhood after he had torn his room apart. He was arrested and then placed on a 5150 at the Sacramento Mental Health Clinic. He told officers that he was upset over his mother's death. Mr. Gatlin told this interviewer during the previous 1017 evaluation (September 1997), "was it

psychotic? I don't know, I thought it was the end of the world, I had to clean myself, purify myself, I tore up the room deliberately but neatly and put it all on a pile and I had to get all the filth out, you do things because it was beckoning you to do it and you had to do it, I had to get everything that was corruptible out." He said that the episode lasted 30-40 minutes and he only spent a few hours under observation at the mental health clinic and then was returned to jail.

Mr. Gatlin has a history of abusing heroin, marijuana, cocaine, PCP, and LSD, and denied use for the past several years. However, the medical records indicate that he was positive for opiates in 1997 (although it was not clear whether or not this was due to prescribed pain medications, given his history of back pain).

## Medical History

Mr. Gatlin reported suffering from multiple episodes of pneumonia due to chlorine poisoning on the job in 1986. According to the medical records and his report, he has been diagnosed with a seizure disorder that began about 1989 and has been treated with Dilantin, although he is currently on valproic acid. He also said that he sustained a head injury secondary to being kicked in the head during boot camp while in the Marines in the early 1970's. He has a history of multiple neck and back surgeries for disc herniation with chronic back pain, pleural thickening allegedly due to asbestos exposure (defendant's report), and possible renal disease. He also complained of "chest pain, bad lungs, liver, and kidneys." He has a history of leaving hospitals against medical advice.

## Social-Developmental History

Mr. Gatlin was born in San Francisco in 1954. He was one of nine siblings born to his mother, seven of whom where biological children of his father. His parents divorced when he was four years old. His father died in 1974 of cancer. His mother remarried when he was about six years old. She died in 1994. He was close to his stepfather who died in 1995. Mr. Gatlin described himself as "the black sheep of the family...they didn't want anything to do with me." Starting when he was about six years of age and lasting "a few years", he said that he was sexually abused by "certain men in the neighborhood" in the form of anal penetration. He said that he used to blame himself and God and then "learned it wasn't me" stating, "I started cursing God, he said he ain't nothing but a little punk, that's why I was getting screwed in the butt as a little boy." He said that his



J. Kline, Ph.D.
Gatlin Evaluation
Page 5 of 9

brother "thought he was Jesus Christ" and committed suicide by hanging at age 35.

Mr. Gatlin did not complete High School but subsequently received his GED. He was in the Marine Corp Reserves 1971-1972 and received a dishonorable discharge secondary to "being arrested for buying stolen TV's." He has a 17 year old daughter from a woman he lived with for a few years. He has been attempting to contact her in Sacramento. He was married for about 5 months in 1991 when he lived in Phoenix where he and his wife provided emotional and spiritual support to the homeless. He said that this relationship did not work out because he gave away too many of their personal items for religious reasons. His employment has been sporadic and short-term over the years and has consisted of unskilled labor. He received a certificate for truck driving in 1991. He also has a history of frequent moves among Sacramento, Fresno, Bakersfield, Phoenix, Louisiana, New York, and Florida. He identified himself as Sunni Muslim and an ex-preacher.

## Test Results

### MMPI-2
The Validity Scale Scores on the MMPI-2 are indicative of the presence of severe psychopathology. Although the Validity Scale profile contraindicates blatant malingering, exaggeration of psychopathology is a possibility that must be considered. However, Mr. Gatlin's history of psychiatric symptoms, idiosyncratic behavior, and current presentation is consistent with the level of psychopathology manifested on the MMPI-2. Individuals with Clinical Scale Score elevations similar to that of Mr. Gatlin are typically described as having disturbed thinking, ideas of reference, and delusions are often diagnosed with schizophrenia or paranoid disorders. They are often preoccupied with abstract matters and withdraw into fantasy as a way of coping with the outside world. They feel socially alienated, suspicious, depressed, and inferior. They typically avoid emotional ties with others and resent demands placed on them. They are rebellious and harbor hostility and aggression which they have difficulty expressing in modulated ways. Individuals with this profile type often have deviant social and religious convictions. Somatic preoccupations are common, may substitute for dysphoric feelings, and may even become delusional at times.

## Rorschach

Mr. Gatlin scored positive on the schizophrenia, depression, and hypervigilance indexes. These results are indicative of the presence of a significant psychotic thought process, depressive affects, and a hyperalertness in order to avoid victimization. In addition, the results suggest feelings of chronic stimulus overload, excessive unorganized need states, an inconsistent style of problem solving, and labile affects despite attempts to avoid emotions. Individuals with these results are typically accurate in perceiving and responding to obvious and uncomplicated aspects of the external environment; however, reality testing often becomes impaired when faced with more ambiguous and complex situations. Individuals with these Rorschach results are often diagnosed with schizophrenia, paranoid disorder, and/or depression.

## Current Psychological Status, Impressions & Conclusions

Mr. Gatlin is a 44 year old, divorced, unemployed, incarcerated African-American man. He presented for this evaluation as oriented, behaviorally organized, well groomed, and cooperative and he recalled our previous contact in September of last year. He wore a neck brace stating that this was due to his history of neck and back injuries and "I got myself in difficulty with officers here and each time they grabbed me around the neck." He informed this evaluator that he was found guilty of auto theft and stated, "I already told them I took the car…it didn't matter because I was having psychotic manifestations…I call it living in the physical world and the spiritual world…I found myself always asking God about what I was doing and whether it was right or wrong…you have God and you have Satan and to me they all sound alike, they will deceive you…so I ask God, is it you or is it Satan?" His speech was mildly pressured and although he was engaging he would often become overly abstract and raise religious ideas and become circumstantial when asked concrete questions. His affect was typically bright but inconsistent with his mood which seemed dysphoric and with his thought content which he described as frequently negative. When asked specifically about his mood he began complaining of multiple somatic problems which is consistent with the testing results that suggests a tendency to route his negative feelings into bodily channels. He reported his sleep pattern and appetite as adequate. He complained of a poor memory. He admitted to feeling as if his thoughts are controlled by outside forces and that thoughts are forced into his mind from the outside. He also admitted to pervasive ideas of reference believing that there is "great significance for everything, for me…a lot of people just can't see it." He denied current or



recent racing thoughts, thought broadcasting, thought withdrawal, and auditory and visual hallucinations. Although he said that God talks to him this was not in the form of auditory hallucinations. He also harbored grandiose and narcissistic ideas. For example, at one point during the interview he said, "people are there for me to be aware of my actions...in my world, just for my purpose, to be a part of what I need to know." Mr. Gatlin clearly feels a pervasive relationship with God and Satan, although he denied ever feeling as if he actually was either one of them.

Based on Mr. Gatlin's history, his current presentation, and the results of the psychological testing, it appears that he suffers from schizotypal and antisocial personality disorders with paranoid and narcissistic features. He has an impaired self-image related in part to being sexually victimized as a youth. He suffers from transient psychotic episodes with paranoid themes and manic features when excessively stressed. He has a relatively sustained psychotic thought process but it does not manifest itself in florid and sustained auditory hallucinations or delusions. Rather, it expresses itself as paranoid hypervigilance, religious preoccupation, grandiose ideas, excessive preoccupation with the significance of all things to him (ideas of reference), odd beliefs (the trees talk to him), and overly abstract and impressionistic ideas. His typical thought process could also be described as "near psychosis" or "psychotic-like" and co-occurs with chronic dysphoria. Although his perceptions are accurate when faced with obvious aspects of the external world, when situations become complex, affect-laden, and ambiguous his reality testing becomes impaired. Given the character of his thought disorder, his antisocial adjustment, and his social estrangement, his comment about "living in the physical world and the spiritual world" suggests great difficulty in blending his religious beliefs with practical adjustment as if he can live in neither place successfully. The affable social front he often presents to authority figures belies underlying feelings of resentment, hostility, and rebellion against the demands of others, and great difficulty appropriately modulating the expression of strong feelings.

Mr. Gatlin's clinical picture is complicated by multiple medical problems and somatic complaints. It is likely that at least some of these complaints, and possibly some of his seizures, are in part psychogenic and replace troublesome feelings related to his history of trauma, failures, and antisocial behaviors.



J. Kline, Ph.D.
Gatlin Evaluation
Page 8 of 9

## DSM-IV Diagnoses

Axis I     Dysthymic Disorder
             History of Brief Psychotic Episodes
             History of Substance-Related Disorders
             History of Sexual Trauma
Axis II    Antisocial Personality Disorder
             Schizotypal Personality Disorder
             Paranoid & Narcissistic Personality Features
Axis III   Seizure disorder, history of multiple neck and back surgeries
             Otherwise deferred
Axis IV   Psychosocial Stressors:  incarceration
Axis V    Global Assessment of Functioning, Current:   35


Respectfully Submitted,


_____

Jeffrey S. Kline, Ph.D.

# PSYCHIATRIST PROGRESS NOTE
## for
## Schizophrenia And Psychotic Disorder, NOS
## Page 1

Date | 8/25/05

| Medication | Directions | Expires | Physician | Target Sx | 1-6 Severity |
|---|---|---|---|---|---|
| Baclofen 10mg | take 1 Tab 3 Times Daily | 10/16/05 | Mcallister | | |
| Enteric Aspirin 81mg Tab | take 1 Tab Daily | 10/16/05 | Mcallister | | |
| Dyazide | take 1 Cap Daily | 10/16/05 | Mcallister | | |
| Psyllium Powder | 1 Tablespoonful Qdw/ Water | 10/16/05 | Mcallister | | |
| Promethazine 25mg | take 1 Tab 4 Times Daily as Needed | 9/29/05 | Mcallister | | |
| Analgesic Balm 30gm | apply To Right Thigh twice Daily | 9/29/05 | Mcallister | | |
| Maalox Extra Strength | 10cc Tid Prn | 11/3/05 | Mcallister | | |
| Ranitidine 150mg | take 1 Tab 2 Times Daily | 11/3/05 | Mcallister | | |
| Gabapentin 400mg Tab | 2 Tabs Tid | 11/3/05 | Mcallister | | |
| Peginterferon Alfa-2a 180 | 180mcg Sq Q Week | 8/30/05 | Haile | | |
| Ribavirin 200mg Capsules | 3 Caps (600mg) Bid | 8/30/05 | Haile | | |

| | AIMS | Date |
|---|---|---|
| | 0 | 8/9/05 |

**The Controlling Axis I Diagnosis in this patient is:**

Schizoaffective Disorder    M O O D    D.O. NOS

Polysubstance Dependence, Institutional Remission

Major Depressive Disorder, Severe with Psychotic Features

Axis II

Personality Disorder NOS with narcissistic and antisocial features

Allergies
None Known

Axis III

Hepatitis, seizures, chronic pain, GI erosion

| Weight (lbs) | 261 | 266 | 261 | 269 | 263 | 265 | 246 | 230 |
|---|---|---|---|---|---|---|---|---|
| Date | 7/21/03 | 4/15/04 | 6/21/04 | 11/30/04 | 2/15/05 | 5/10/05 | 8/3/05 | 8/25/5 |
| % Change | | 2% | 0% | 3% | 1% | 2% | -6% | - |

| | Current | Previous | | Medication History | Max Dose | Wks Max | Reason for Failure |
|---|---|---|---|---|---|---|---|
| | | | Stage 1 | | | | |
| Positive Sx | 9 | 11 | Stage 2 | | | | |
| | | | Stage 3 | | | | |
| Negative Sx | 5 | 8 | Stage 4 | | | | |
| | | | Stage 5 | | | | |

Keyhea Expires

| Side Effects | | 1-6 Severity |
|---|---|---|
| N.R. | | |
| | | |
| | | |
| | | |

Reason Seen
I D TT

Date | 8/25/05

| PSYCHIATRIST PROGRESS NOTES MH 3 Page 1 | LEVEL OF CARE | CDC# | P19908 | |
|---|---|---|---|---|
| | CCCMS | Last | Gatlin | First | Fredrick |
| Confidential Patient/Client Information | | DOB | 6/13/54 | Institution | CMF |
| Department of Corrections and Rehabilitation    State of California | | Eth | Bla | House | I-1411 |

A₁₀

California Medical Facility

| Medication | Directions | Expires | Physician | Status | Target Sx |
|---|---|---|---|---|---|
| Risperidone 4mg Tablet 1 Tab Q Evening See Am | | 11/21/02 | Pacifico, Paz | Continue | Hallucinations |
| Risperidone 3mg Tab 1 Tab Qam See Evening Dose | | 11/21/02 | Pacifico, Paz | Continue | Delusions |
| Phenytoin 100mg 1 Cap Qhs | | 10/1/02 | Kimball, | | Seizure |
| Paroxetine 20mg 1 Tab Q Am | | 11/21/02 | Pacifico, Paz | Continue | Depression |
| Trazodone 50mg 1 Tab Qevening (w/100mg= 150mg) | | 11/21/02 | Pacifico, Paz | Continue | Depression |
| Trazodone 100mg Tab 1 Tab Qevening (w/50mg= 150mg) | | 11/21/02 | Pacifico, Paz | Continue | " |
| Amitriptyline 10mg 1 Tab Q Eve For H/a & Chronic Pain | | 10/1/02 | Kimball, | | |
| Gabapentin 600mg Tablet 1 Tab Tid | | 9/26/02 | Kimball, | | |
| Eucerin Cream Apply Daily To Feet | | 11/14/02 | Sawicki, | | |
| Tolnaftate 1% Soln 10ml Apply To Nails 2 Times Daily | | 11/14/02 | Sawicki, | | |
| Naproxen 500mg Tab 1 Tab Bid | | 11/6/02 | Geraghty, | | |

| | AIMS | Date |
|---|---|---|
| | 0 | 7/26/02 |
| | 0 | 9/12/0> |
| | | |
| | | |
| | | |

**Axis I**
Schizoaffective Disorder
Polysubstance Dependence, Institutional Remission

**Axis II**          **Allergies**
Personality Disorder NOS with narcissistic and antisocial

**Axis III**          **Side Effects**
Hepatitis, seizures, chronic pain          There is NO evidence of any side effects.

Reason Seen: Patient Request          Keyhea Expires _____

**Subjective**
I'm still okay. I have just stopped all my meds exc/ for pain. Apparently still doing okay.

**Objective**
Still have incontinence when he takes his psych meds so he stopped it. Everything still okay. His incontinence subsided. No voices. Delusional about the _____ comes every day but not a bother.

**Assessment**
Doing okay inspite of no meds. no problems at present.

**Plan**
Will continue to monitor.

Date    9/11/02          Pacifico          [signature] Jm Pacifico MD
                         Psychiatrist

| PSYCHIATRIST PROGRESS NOTES | LEVEL OF CARE | Last Name | First Name |
|---|---|---|---|
| MH 3 | EOP | Gatlin | Fredrick |
| | | House | Institution | Age |
| | | N-301L | CMF | 48 |
| Confidential Patient/Client Information | | CDC# | | |
| Department of Corrections    State of California | | P19908 | DOB | 6/13/54 |

All

Case 4:07-cv-03696-CW    Document 14-2    Filed 09/25/2008    Page 30 of 36

# PSYCHIATRIST PROGRESS NOTE
## for
## Schizophrenia And Psychotic Disorder, NOS
## Page 1

Date | 4/11/05

| Medication | Directions | Expires | Physician | Target Sx | 1-6 Severity |
|---|---|---|---|---|---|
| Targeted Monitored Druggabapentin800mg Tid | | 6/4/05 | Shellcroft | | |
| Hepatitis B Vaccineseries | | 9/13/05 | Haile | | |
| Promethazine 25mg1 Tab Bid | | 6/30/05 | Mcallister | | |
| Hepatitis A Vaccineseries | | 9/13/05 | Haile | | |
| Methadone 5mg Tab1/2 Tab (2.5mg) Bid | | 4/16/05 | Haile | | |
| Aspirin 81mg Ec Tab1 Tab Qd | | 4/22/05 | Haile | | |
| Psyllium Powder1 Tablespoonful W/ 8ozwater Daily | | 4/22/05 | Haile | | |
| Baclofen 10mg1 Tab Tid Prnspasm | | 4/22/05 | Haile | | |

| | AIMS | Date |
|---|---|---|
| **The Controlling Axis I Diagnosis for this patient is:** | 0 | 7/26/02 |
| Schizoaffective Disorder | 0 | 10/23/02 |
| Polysubstance Dependence, Institutional Remission | 0 | 1/15/03 |
| | 0 | 4/29/03 |
| **Axis II** | 0 | 4/15/04 |
| Personality Disorder NOS with narcissistic and antisocial features | | 2/15/05 |

Allergies
None Known

**AxisIII**
Hepatitis, seizures, chronic pain

| Weight (lbs) | 261 | 266 | 261 | 269 | 263 |
|---|---|---|---|---|---|
| Date | 7/21/03 | 4/15/04 | 6/21/04 | 11/30/04 | 2/15/05 |
| % Change | | 2% | 0% | 3% | 1% |

| | Medication History | Max Dose | Wks Max | Reason for Failure |
|---|---|---|---|---|
| Stage 1 | | | | |
| Stage 2 | | | | |
| Stage 3 | | | | |
| Stage 4 | | | | |
| Stage 5 | | | | |

| Patient | | Previous | |
|---|---|---|---|
| Positive Sx | 14 | Positive Sx | 11 |
| Negative Sx | 6 | Negative Sx | 8 |

**Suicide Risk Factors**
Past Suicide Ideation/Threats
Previous Suicide Attempts
History of Substance Abuse

| Side Effects | 1-6 Severity |
|---|---|
| No psych need | |
| | |
| | |
| | |

**Keyhea Expires**
NA

**Reason Seen**
Medline

Date 4/11/05

| PSYCHIATRIST PROGRESS NOTES | LEVEL OF CARE | | |
|---|---|---|---|
| | | CDC# | P19908 |
| MH 3 | EOP | Last | Gatlin |
| Page 1 | | | First Fredrick |
| | | DOB | 6/13/54 |
| Confidential Patient/Client Information | | | Institution CMF |
| Department of Corrections    State of California | | Eth | Bla    House N-212l |

## Addendum to MH-2 <Unrelated Table>

2/5/2005

Mr. Gatlin  ( P19908 ) N–212L has not been receiving adequate hours of

his scheduled treatment  activities.    His diagnosis is Schizoaffective Disorder.

He reports (or is unwilling to report) that this is because:

> Historially refused specific therapeutic wing work assignment time, and therefore did not receive credit.

The clinical team believes his poor attendance is largely due to:

> Historially refused specific therapeutic wing work assignment time, and therefore did not receive credit.

**Plan:**

Continue EOP Level of Care.  Due to Mr. Gatlin's decreased level of participation, he will be seen twice a week by his primary clinician in an effort to assist him in improving his level of participation.
Additionally:

Beck _____    _____

| MENTAL HEALTH EVALUATION | LEVEL OF CARE | CDC# | P19908 | | |
|---|---|---|---|---|---|
| ADDENDUM  CDC MH 2 | EOP | Last | Gatlin | First | Fredrick |
| Confidential Client/Patient Information | | DOB | 6/13/54 | Institution | CMF |
| Department of Corrections    State of California | | Eth | Bla | House | N-212l |

| California Medical Facility | | | | | | Department of Corrections |
|---|---|---|---|---|---|---|
| **Administrative Information** | | | **EVALUATION AND TREATMENT PLAN (MH 2 PT)** | | Date | 2/15/05 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Type of Review:** | Quarterly | **Setting:** | EOP | **Gender** | | **Date Entered Rx Level** | | 4/18/01 |
| **CMF Arrival** | 4/27/04 | **Comit Time** | 26-life | **Points** | 033 | **Ethnicity** | | BLA |
| **Initial Arrival** | 4/10/01 | **Term** | Third | **Custody** | CLOB | **Language** | | English |
| **Release Type** | LIFE | **County Comit** | Santa Clara | **DOB** | 6/13/54 | **Vict/Pred** | | [] |
| **Release Date** | | **Commiting Offenses** | Theft of Auto or Vehicle | | | **Priv/Wrk Group** | | A1 A |
| **Housing** | N-206L | | | | | **SS#** | | |
| **IDTT Date** | 2/15/05 | **TB Code** | 22 | **Hepatitis Code** | 0 | **HIV Code** | 0 | |

**M.S.E. for Schizophrenia or Psychotic Disorder, NOS    Positive Symptoms**

| | |
|---|---|
| **Suspiciousness** | VERY MILD-The patient seems on guard or is reluctant to respond to some 'personal' questions or reports being overly self conscious in public. (2) |
| **Unusual Thoughts** | MODERATELY SEVERE-Delusions present with some preoccupation, or some areas of functioning disrupted by delusional thinking. (5) |
| **Hallucinations** | MODERATE-Occasional verbal, or other sensory hallucination with no functional inpairment. (4) |
| **Conceptual Disorganization** | MILD-Speech a bit hard to understand or make sense of due to tangentiality, circumstantiality, or sudden topic shifts. (3) |

**Negative Symptoms**

| | |
|---|---|
| **Prolonged Response** | NORMAL-No abnormal pauses before speaking. (1) |
| **Emotion** | MINIMAL-Spontaneous expressions of emotion occur when expected. However there is a reduction in degree of intensity of emotions expressed. (2) |
| **Reduced Social Drive** | MINIMAL-Minimal reduction in either the desire to initiate social contacts or the number of social relationships. (2) |
| **Grooming** | NORMAL-Patient is clean and dressed neatly. (1) |

| | | | |
|---|---|---|---|
| **Positive Symptoms** 14 | 0=Best 24=Worst | **Negative Symptoms** 6 | 0=Best 20=Worst |
| **Previous Positive Sx** 11 | | **Previous Negative Sx** 8 | |

| | |
|---|---|
| ☐ Unreported Due To Lack of Rapport | ☐ Patient Uncooperative |
| ☐ Unreported Due To Negative Symptoms | ☐ Difficult to Assess Due to Formal Thought Disorder |

**Comments MSE**    Confidence in assessment  0=Not at all  5=Very confident   4

The I/P has changed cells x3 since arriving on the N2 unit and reports that his cell mates are "unclean" and that he can not attend to his religious duties when living with people who are not clean, continues to state that God gave him a vision of his death and when he's going to die. States that he regularly receives "spiritual visions" and that he "understands' things about the spiritual world that other

| Participation | Motivation | Condition | ADLS |
|---|---|---|---|
| Usually | Fair | Stable | Good |

| | | | |
|---|---|---|---|
| **MENTAL HEALTH EVALUATION** and **TREATMENT PLAN** CDC MH 2 Page 1 of 3 Confidential Client/Patient Information | **LEVEL OF CARE** EOP | CDC# | P19908 |
| | | Last | Gatlin    First Fredrick |
| | | DOB | 6/13/54    Institution CMF |
| Department of Corrections    State of California | | Eth | Bla    House N-206l |

## Current Working Diagnosis

**Axis I**

295.70  **Schizoaffective Disorder**

304.80  **Polysubstance Dependence, Institutional Remission**

**Axis II**

301.9  **Personality Disorder NOS with narcissistic and antisocial features**

**Axis III**
Hepatitis, seizures, chronic pain

**Axis IV**
Incarceration

**Axis V**

| AIMS | Date |
|---|---|
| 0 | 7/26/02 |
| 0 | 10/23/02 |
| 0 | 1/15/03 |
| 0 | 4/29/03 |
| 0 | 4/15/04 |
|  | 2/15/05 |

Keyhea Expires

**48** Calculated GAF

| 35 | 45 | 70 | 40 |
|---|---|---|---|
| Psych Impair | Soc Skill | danger | adl |

**Diagnostic Comments:**
(1/15/03) Diagnostic picture remains essentially unchanged. (4/29/03) relative to past team's evaluation shows improvement is some areas (hallucinations, cooperation, med compliance) however consistent areas for improvement are unusual thoughts, suspiciousness, isolation. (4/04) Dx is constant with report symptoms (visual Hallucination, suspiciousness, isolation, delusions).

### Treatment Plan

| Problem List | Objectives | Plan/Modality |
|---|---|---|
| Delusions/hallucinations | Reduce Psychotic Symptoms | 1:1 Case Management |
|  |  | Medication (Refuses) |
|  |  | Groups: Coping Skills, Living Skills, Houses of Healing, RT |
| Paranoia | Improve Coping Skills | 1:1 Case Management |
|  |  | Medication (Refuses) |
|  |  | Groups: Bibliotherapy, RT |
|  |  | Autobiographics, Curr. Events. |
| Withdrawal | Decrease Maladaptive Behavior | 1:1 Case Management |
|  |  | Medication (Refuses) |
|  |  | Groups: Coping Skills, Living Skills, ADL, Health Education |

### Medications

Aspirin 81mg Ec Tab 1 Tab Qd

Dyazide 1 Cap Qd

Docusate Sodium 250mg 1 Cap Bid

Psyllium Powder 1 Tablespoonful W/ 8oz water Daily

Timolol .5% Opth Sol 10ml 1 Drop In Each Eye Every 12hrs/lf 1/24

Med Compliant  N/A
Clozapine Date
Clozapine Months
Drug Allergies  None Known
Side Effects: There is NO evidence of any side effects.

| Weight (lbs) | 261 | 266 | 261 | 269 | 263 | | |
|---|---|---|---|---|---|---|---|
| Date | 7/21/03 | 4/15/04 | 6/21/04 | 11/30/04 | 2/15/05 | | |
| % Change | | 1.9% | 0.0% | 3.1% | 0.8% | | |

MENTAL HEALTH EVALUATION
and
TREATMENT PLAN
CDC MH 2
Page 2 of 3
Confidential Client/Patient Information
Department of Corrections          State of California

LEVEL OF CARE
EOP

CDC#  P19908
Last  Gatlin     First  Fredrick
DOB  6/13/54    Institution  CMF
Eth  Bla        House  N-206I

California Medical Facility          Department of Corrections

Date    8/10/05

| Suicide Risk Factors | Past Suicide Ideation/Threats<br>Previous Suicide Attempts<br>History of Substance Abuse<br>History of Mental Illness<br>Long or life sentence, three strikes<br>Chronic serious or terminal illness | Physical Disabilities<br>**Other, Medical**<br><br>Clark Track [  ] |

## Current Behavior Alerts:

| Alerts: | Suicide | Aggression | Self Injury | Unpredictable | Sexual | ICC Advocate |
|---------|---------|------------|-------------|---------------|--------|--------------|
|         | Low     | Low        | Negligible  | Low           | Low    | No           |

**Behavior Alerts**
MH4, 4/17/01: "I/P reports history of 2 suicide attempts–1974 drank Brasso, 1988 cut wrist.

## Subjective Complaints:
Began by saying "I'm good." When asked what happened in group last week, I/P said "Excuse me, you called me in here to ask me about last week? I'm a very sick man and I was asleep." Regarding his medical issues, he reports that he is unable to eat, vomiting, and on a liquid diet. He is also not taking psych meds, "because I got a hole in my stomach. Don't want to damage it anymore. It's real painful sometimes..." Patient spent a lot of time talking in a bragging manner about his porter job. He claims to be the "lead porter" on N-2 and about being a counselor to other patient on the unit.

## Objective Findings:
Initial presentation at IDTT was tired and not feeling well as evidenced by sitting with his head hanging forward, looking at the floor, and talking in a low raspy voice. When I/P became agitated, his posture improved and he spoke in a loud and audible voice. I/P has refused 40% of group hours offered and cites being too tired to attend due to medical difficulties. He presented as very well groomed, articulate, coherent. He did not appear to be depressed although, he complained of mild depression due to his medical conditions.

## Current Assessment:
MD stated agreement that the patient does not appear depressed. No SI or HI reported. Patient has been on Hep C treatment since 6/7/05 with no ill side effects. He has been off of psych medications for at least 5 months with no ill effects. For about 3 weeks, a decrease in energy was observed in the am following the start of Pegasys, but his energy has greatly improved in the past month. No ICP referral required as the patient is being made CCCMS.

## Current Plan and Treatment Recommendations:
IDTT recommends that I/P move to CCCMS. CCI will arrange TMD designation due to medical issues. Patient can continue with medical treatment as a CCC patient. Mr. Gatlin was smiling and appeared content at the end of IDTT when told he would be CCCMS. He voiced no objection. I/P is encouraged to welcome new challenges and personal gains from living in a less restrictive environment.

## Patient Education
I/P educated as to the psychological side-effects of Pegasys, and will inform clinical staff of any concerns.

| ITP Referral Considered<br>☒ Yes ☐ No ☐ N/A<br><br>Patient Needs to be Seen by IDTT within: **90** Days<br><br>Next Review before: **11/7/05**<br><br>☐ Unit IV Patient | Treatment Team | N-2 | Title | Signature |
|---|---|---|---|---|
| | Pacifico | | Team Leader | pnpacifico  m.d. |
| | Werth | | Case Manager | SWerth, PSW |
| | Taylor | | P.T. | S. Taylor, P.T |
| | | | | |
| | Haley | | Counsellor | present  YES |

| MENTAL HEALTH EVALUATION and<br>TREATMENT PLAN<br>CDC MH 2<br>Page 3 of 3<br>Confidential Client/Patient Information<br><br>Department of Corrections<br>and Rehabilitation          State of California | LEVEL OF CARE<br><br>EOP | CDC# **P19908** | |
|---|---|---|---|
| | | Last **Gatlin** | First **Fredrick** |
| | | DOB **6/13/54** | Institution **CMF** |
| | | Eth **Bla** | House **N-212l** |

S   B .  R    V   I   C    B

GATLIN                     #C-07-3696-CW  (PR)

      V.              PROOF OF SERVICE

TILTON
_____/


I certify that I am over the age of 18 and am a party to this action. I certi-
fy that I serviced the below parties with copy of (MOTION) by depositing copy
in the U.S. Mail at Vacaville, California.


Clerk of the Court                  Office of Attorney General

U.S. District Court (Northern)      State of California

450 Golden Gate Avenue              455 Golden Gate Avenue

San Francisco, CA 94102             San Francisco, CA 94102

Attn: HON. CLAUDIA WILKINS (Judge)
      U.S. District Court (Northern)
      1301 Clay Street, #400S
      Oakland, CA 94612-5212


I DECLARE UNDER PENALTY OF PERJURY AND THE LAWS OF THE UNITED STATES THAT THE

FOREGOING IS TRUE. THIS SERVICE WAS EXECUTED ON 11/11/2007 AT VACAVILLE, CA.


FREDERICK GATLIN